**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| 24th Street Holdings LLC, | No. CV-25-00157-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| BP Products North America Incorporated, et al., | |
| Defendants. | |

BP Products North America, Inc. ("Defendant") leased a parcel of real property from 24th Street Holdings LLC ("Plaintiff"). Under the parties' lease agreement, Defendant was required to obtain and maintain insurance coverage, either through third-party insurance providers or via self-insurance.

After a fire caused damage to a building on the leased property, Plaintiff submitted a claim to Defendant and Defendant's insurance carrier. Defendant initially responded by stating that Defendant's insurance carrier had received the claim but later informed Plaintiff that it had exercised its right to self-insure and then rejected the claim.

In this action, Plaintiff asserts various contract and tort claims against Defendant. (Doc. 23.) Now pending before the Court is Defendant's motion to dismiss a portion of those claims. (Doc. 27.) For the reasons that follow, the motion is granted.

## BACKGROUND

I.    Factual Allegations

The following facts, presumed true, are derived from the Second Amended

1 Complaint ("SAC").  (Doc. 23.)

2    A.    **The Parties And The Challenged Conduct**

3    Plaintiff "was a limited liability company organized and existing under the laws of

4 the State of Texas and is duly authorized to do business in the State of Arizona."  (*Id.* ¶ 1.)

5    Defendant "is now, and at all times mentioned herein, was a corporation domiciled

6 in the state of Maryland, with its principal place of business located [in Maryland], doing

7 business in the State of Arizona."  (*Id.* ¶ 2.)

8    Plaintiff owns the real property located at 10 North 24th Street in Phoenix, Arizona

9 ("the Subject Property").  (*Id.* ¶ 8.)  On or about December 22, 2022, Plaintiff and

10 Defendant entered into a written agreement ("the Lease Agreement"), "under the terms of

11 which the Subject Property was to be leased by Plaintiff to Defendant[]."  (*Id.* ¶ 9.)

12    Before executing the Lease Agreement, "Plaintiff and Defendant[] entered into a

13 series of negotiations regarding the terms of the Lease Agreement."  (*Id.* ¶ 10.)  During

14 these negotiations, "Plaintiff requested that certain terms and provisions be added to the

15 Lease Agreement requiring Defendant[] to obtain and maintain, at Defendant['s] own cost

16 and expense, insurance coverage, including but not limited to Special Form Cause of Loss

17 Insurance, covering the building, improvements, structures and fixtures at the Subject

18 Property (the 'Subject Insurance') either through insurance providers or through self-

19 insurance by Defendant[] throughout the term of the Lease Agreement."    (*Id.*)

20 "Defendant[] accepted this request," and the Lease Agreement contains "terms requiring

21 Defendant[] to obtain and maintain, at Defendant['s] own cost and expense, the Subject

22 Insurance throughout the term of the Lease Agreement, either through insurance providers

23 or through self-insurance by Defendant[]."  (*Id.* ¶ 11.)

24    "Pursuant to Paragraph 11(d) of the Lease Agreement, Defendant[] had the express

25 right to self-insure," but Plaintiff alleges this provision "did not relieve Defendant[] of [its]

26 obligation to provide coverage equivalent in scope and protection to the specified Special

27 Form Cause of Loss insurance."  (*Id.* ¶ 12.)  Plaintiff further alleges that it "relied on this

28 provision in executing the Lease Agreement, reasonably expecting such coverage would

1    be enforceable and effective." (*Id.*)

2        On or about January 20, 2023, a fire caused damage to the Subject Property. (*Id.*

3    ¶ 13.) "Plaintiff suffered substantial losses as a result of the" fire, which are "the nature

4    and type of losses to be covered by the Subject Insurance." (*Id.* ¶¶ 15-16.)

5        After the fire, "Plaintiff submitted its claim to Defendant[] and Defendant['s]

6    insurance carrier" and "requested copies of any applicable policies of insurance which

7    provided the Subject Insurance described in the Lease Agreement." (*Id.* ¶ 17.) "In

8    response, [Defendant] produced a Memorandum of Insurance naming Marsh USA LLC,

9    as the 'Producer' and Companies Affording Coverage as 'Old Republic Insurance

10   Company' and AGCS Marine Insurance Company . . . ." (*Id.*) "Subsequently, Allianz

11   Global was appointed as insurance adjuster on behalf of [Defendant] to investigate," and

12   "Defendant[], through [its] conduct and through the conduct of [its] insurer, acknowledged

13   receipt of the claim, and indicated the claim was being investigated." (*Id.*)

14       On or about April 7, 2023, "Defendant[] sent a letter to Plaintiff acknowledging that

15   Defendant['s] insurance carrier had received a claim" and "did not claim, exercise, or even

16   reference any alleged right by Defendant[] to self-insure." (*Id.* ¶ 19.) "Defendant['s]

17   conduct at this time was consistent with Defendant['s] representation that a policy was in

18   place to provide the Subject Insurance." (*Id.*)

19       On or about May 3, 2023, "Defendant[] sent another letter to Plaintiff, which

20   reiterated the positions taken in the April 7, 2023 letter" and again "did not claim, exercise,

21   or even reference any alleged right by Defendant[] to self-insure." (*Id.* ¶ 21.) Plaintiff

22   continued "to pursue the open claim with Defendant['s] insurance provider." (*Id.* ¶ 22.)

23       On or about May 18, 2023, "Defendant[] sent another letter to Plaintiff, in which

24   Defendant[] for the first time changed [its] position, and began claiming that Defendant[]

25   had allegedly exercised [its] right to self-insure under the Lease Agreement." (*Id.* ¶ 23.)

26   "By taking this position, Defendant[] began claiming [it] chose to self-insure the insurance

27   obligations under the Lease Agreement and, therefore, act as the insurer to Plaintiff for"

28   the fire. (*Id.*) Plaintiff alleges that "[t]his was contrary to all representations and

communications that Defendant[] and Defendant['s] insurer had previously had with Plaintiff." (*Id.*)  "At no time prior to May 18, 2023, did Defendant[] assert or disclose to Plaintiff that [it was] electing to self-insure." (*Id.* ¶ 18.)

Plaintiff further alleges that "Defendant[] wrongfully took the position that Defendant[] had no insurance obligations in connection with" the fire "and, as a result, wrongfully demanded Allianz Global LLC to cease its investigation and denied Plaintiff's claim." (*Id.* ¶ 24.)

B.     **The Lease Agreement**[1]

The relevant provisions of the Lease Agreement (*id.* at 34-89) are as follows.  The first paragraph provides the lease is "by and between 24TH STREET HOLDINGS, LLC" and "BP PRODUCTS NORTH AMERICA INC." (*Id.* at 34.)  The property that is the subject of the Lease Agreement is located at "10 North 24th Street, Phoenix, Arizona 85034." (*Id.*)  Later, the Lease Agreement states that "[Plaintiff] hereby demises and leases the Premises to [Defendant], and [Defendant] hereby leases and takes the Premises from [Plaintiff]." (*Id.* at 35.)

Section 11 of the Lease Agreement is titled "Indemnification; Insurance." (*Id.* at 49.)  Section 11(b), titled "[Defendant]'s Insurance," provides that "[Defendant], at [Defendant]'s expense, shall obtain and maintain in full force and effect through the Term of this Lease . . . Special Form Cause of Loss insurance, on a replacement cost valuation basis, agreed amount/no coinsurance, covering the building, improvements, structures and fixtures at the Premises." (*Id.*)

Section 11(c), titled "[Plaintiff] as Additional Insured," provides that "[t]o the extent permitted by law and to the extent of [Defendant]'s express obligations contained in this Lease, [Plaintiff] and [Plaintiff]'s mortgagee (provided that [Defendant] has received an SNDA as specified in Paragraph 10 above from such mortgagee) shall be named as

---

[1]     The Lease Agreement is attached as Exhibit A to the SAC.  (Doc. 23 at 34-89.)  Ordinarily, if a district court considers evidence outside the pleadings in ruling on a motion to dismiss, it must convert the motion into a motion for summary judgment and give the nonmovant an opportunity to respond.  *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).  A district court may, however, consider "documents attached to the complaint" in ruling on a motion to dismiss.  *Id.* at 908.

1    additional insureds with respect to the commercial general liability insurance policy or

2    policies maintained by [Defendant] pursuant to this Paragraph 11." (*Id.* at 51.)  Section

3    11(c) also provides that "[c]ertificate(s) of such policies shall be delivered to [Plaintiff] not

4    later than thirty (30) days after the Commencement Date." (*Id.*)

5         Section 11(d), titled "Self-Insurance," provides that "[n]otwithstanding anything

6    contained in this Lease to the contrary, so long as the Tenant is [Defendant] (or any of its

7    affiliates or subsidiaries), the provisions of any insurance coverages may be self-insured."

8    (*Id.*)

9    II.    <u>Procedural History</u>

10        On January 17, 2025, Plaintiff initiated this action.  (Doc. 1.)

11        On March 3, 2025, after being ordered to file an amended complaint establishing

12   the relevant jurisdictional facts (Doc. 9), Plaintiff filed the First Amended Complaint (Doc.

13   10).

14        On May 12, 2025, after obtaining Defendant's written consent (Doc. 21), Plaintiff

15   filed the SAC (Doc. 23).  Count One is a claim for breach of contract.  Count Two is a

16   claim for fraudulent misrepresentation.  Count Three is a claim for negligent

17   misrepresentation.  Count Four is a claim for breach of the implied covenant of good faith

18   and fair dealing (insurance).  Count Five is a claim for fraudulent concealment.  Count Six

19   is a claim for declaratory relief.

20        On June 10, 2025, Defendant filed the pending motion to dismiss Counts Two

21   through Five of the SAC.  (Doc. 27.)[2]  The motion later became fully briefed.  (Docs. 29,

22   30.)

23                                    **DISCUSSION**

24   I.     <u>Legal Standard</u>

25        Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient

26   factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re*

27   *Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks

28   ─────────────
     [2]     Defendant's request for oral argument is denied because the issues are fully briefed
     and argument would not aid the decisional process.  *See* LRCiv. 7.2(f).

omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted).  However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80.  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.  The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.    Count Two (Fraudulent Misrepresentation)

In Count Two of the SAC, Plaintiff alleges that Defendant falsely represented that it "would provide insurance coverage for Plaintiff in accordance with Defendant['s] obligations under the Lease Agreement." (Doc. 23 ¶ 33.)  "The false representations made by Defendant[] include . . . (a) Representing in Paragraph 11 of the Lease Agreement . . . that [Defendant] would obtain and maintain Special Form Cause of Loss insurance or self-insure; (b) Failing to disclose at any time prior to May 18, 2023, that [Defendant] had elected to self-insure, despite being asked to provide proof of insurance immediately following the fire on January 20, 2023; (c) Allowing Plaintiff to communicate with [Defendant's] listed insurer and adjusters (Allianz and Marsh USA) for several months, creating the appearance of valid coverage; [and] (d) Failing to name Plaintiff as an additional insured on any general liability or property insurance despite representing otherwise." (*Id.* ¶ 34(a)-(d).)

A.    **The Parties' Arguments**

Defendant argues that Count Two is subject to dismissal for five independent reasons. (Doc. 27 at 4.)  The Court will focus on Defendant's fifth ground for seeking dismissal—the economic loss rule ("ELR")—because, as discussed in Part II.B below, it is dispositive.

1    Citing *Cook v. Orkin Exterminating Co.*, 258 P.3d 149 (Ariz. Ct. App. 2011),
2  Defendant argues that Count Two is barred by the ELR because it "is merely a restyled
3  breach of contract claim" and because, "[b]y Plaintiff's own allegations, [Plaintiff] has
4  sustained 'purely economic loss.'"  (Doc. 27 at 10-11.)

5    In response, Plaintiff cites *Evans v. Singer*, 518 F. Supp. 2d 1134 (D. Ariz. 2007),
6  in support of the argument that that ELR "does not apply wholesale to all lawsuits involving
7  a contract," but rather "[i]n limited circumstances, such as products liability or construction
8  defect cases, the [ELR] can bar 'a party from recovering economic damages in tort unless
9  accompanied by physical harm.'"  (Doc. 29 at 5, citation omitted.)  Plaintiff argues that
10 "[t]he Arizona District Court has further recognized the limitations of the [ELR] by
11 emphasizing that it does not bar all negligent misrepresentation actions" and that "[t]he
12 Arizona District Court has emphasized holdings that 'the [ELR] has no application to the
13 tort of fraud under Arizona law.'"  (*Id.*, citation omitted.)  Plaintiff also emphasizes the
14 passage in *Cook* that "whether the [ELR] will apply may vary depending upon context-
15 specific policy considerations and the underlying policies of tort and contract law.'"  (*Id.*
16 at 6, cleaned up.)  Plaintiff further argues that "Arizona law does not bar fraudulent
17 misrepresentation claims lacking physical injury."  (*Id.*)

18   In reply, Defendant cites *Cook* in support of the argument that the "Arizona Court
19 of Appeals has specifically held that the [ELR] may apply to fraud claims."  (Doc. 30 at
20 7.)  Defendant further argues that the "District of Arizona cases cited by Plaintiff pre-date
21 *Cook* and are thus inapposite."  (*Id.*)  Defendant also argues that "policy considerations
22 weigh in favor of applying the [ELR] here."  (*Id.* at 8.)

23   **B.    Analysis**

24   Under Arizona law, a fraudulent misrepresentation claim requires proof of nine
25 elements: "(1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's
26 knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon
27 by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its
28 falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) his consequent and

1    proximate injury." *Carrel v. Lux*, 420 P.2d 564, 568 (Ariz. 1966) (citation omitted).

2        The ELR, however, limits "a contracting party to contractual remedies for the

3    recovery of economic losses unaccompanied by physical injury to persons or other

4    property." *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 667

5    (Ariz. 2010).  The ELR is not applied mechanically and requires consideration of the

6    "relevant policy concerns" presented by the individual factual situation.  *Id.* at 673.  One

7    such policy consideration is the different purposes that contractual and tort remedies serve:

8    "Generally, contract law enforces the expectancy interests between contracting parties and

9    provides redress for parties who fail to receive the benefit of their bargain. . . .  Tort law,

10    in contrast, seeks to protect the public from harm to person or property."  *QC Constr.*

11    *Prods., LLC v. Cohill's Bldg. Specialties, Inc.*, 423 F. Supp. 2d 1008, 1015 (D. Ariz. 2006)

12    (quoting *Carstens v. City of Phx.*, 75 P.3d 1081, 1083 (Ariz. Ct. App. 2003)).

13        In *Cook*, the Cooks filed an action asserting claims for, among other things, breach

14    of contract, negligent and intentional misrepresentation, and fraud arising from an

15    agreement executed with Orkin for termite extermination services at the Cooks' home.

16    *Cook*, 258 P.3d at 151.  The trial court dismissed the Cooks' tort claims pursuant to the

17    ELR and the Arizona Court of Appeals affirmed.  *Id.* at 150.  The appellate court began by

18    noting that "whether the ELR will apply may vary depending upon 'context-specific policy

19    considerations' and 'the underlying policies of tort and contract law.'"  *Id.* at 153 (citing

20    *Flagstaff*, 223 P.3d at 669).  The court concluded that the ELR barred the Cooks' fraud and

21    misrepresentation claims for purely economic losses they suffered from "Orkin's alleged

22    failure to adequately perform its promises under the Agreement."  *Id.*  The court reasoned

23    that "the contract law policy of upholding the parties' expectations favor[s] limiting the

24    Cooks' claims to those in contract and, where there has been no injury besides that to the

25    subject property, there is no strong policy reason to impose tort liability."  *Id.*  In reaching

26    this conclusion, the court expressly rejected the Cooks' "argument that the ELR does not

27    apply to their fraud and misrepresentation claims."  *Id.* at 153 n.6.

28        Plaintiff seeks to distinguish *Cook* by citing the passage in *Flagstaff* that the ELR

should rarely be applied outside the construction-defect context. (Doc. 29 at 6.) But Plaintiff overlooks that *Cook* itself applied the ELR to bar negligence, misrepresentation, and fraud claims arising outside the construction-defect context. *Cook*, 258 P.3d at 152-53. *See also BMO Harris Bank NA v. Corley*, 2022 WL 4781944, *11 n.4 (D. Ariz. 2022) ("To the extent BMO's argument is that . . . the ELR can never apply to tort claims outside the product liability and construction defect contexts, this argument lacks merit. In opinions issued after [2010], Arizona courts have clarified that the ELR may be applied outside those contexts.") (citations omitted). As in *Cook*, the alleged fraudulent misrepresentations all arise from Defendant's alleged failure to adequately perform its promises under the Lease Agreement. (*See, e.g.*, Doc. 23 ¶ 34 ["The false representations made by Defendant[] include . . . (a) Representing in Paragraph 11 of the Lease Agreement . . . that [Defendant] would obtain and maintain Special Form Cause of Loss insurance or self-insure; (b) Failing to disclose . . . that [Defendant] had elected to self-insure . . . ; (c) Allowing Plaintiff to communicate with [Defendant's] listed insurer . . . creating the appearance of valid coverage; [and] (d) Failing to name Plaintiff as an additional insured . . . ."]; *id.* ¶ 36 ["Defendant['s] representations that Defendant[] would provide insurance coverage for Plaintiff in accordance with Defendant['s] obligations under the Lease Agreement were material representations, since these were representations that Defendant[] would perform a substantial and essential part of the Lease Agreement (specifically, providing Plaintiff with the insurance protection described in the express terms of the Lease Agreement)."]; *id.* ¶ 39 [Defendant[] intended that Plaintiff rely on these representations . . . by representing to Plaintiff . . . that Defendant[] would perform all terms of the Lease Agreement . . . ."].) Also as in *Cook*, the alleged loss underlying Count Two is purely economic, stemming from Defendant's alleged failure to perform its contractual promises. *Cook* compels the conclusion that such a claim is barred by the ELR. *Cf. CIT Fin. LLC v. Treon, Aguirre, Newman & Norris PA*, 2016 WL 6610604, *5 (D. Ariz. 2016) (applying the ELR to negligent misrepresentation and common-law fraud claims where "Defendants' alleged misrepresentations [were] inseparable from the essence of the

1    contractual agreement").

2         *Evans* does not compel a different conclusion.  There, a federal district court made

3    a prediction in 2007 about how the Arizona Supreme Court would apply the ELR to certain

4    tort claims.  *Evans*, 518 F. Supp. 2d at 1138-47.  When making that prediction, the *Evans*

5    court obviously did not have the benefit of *Cook*, which was not decided until 2011 and

6    which, as discussed above, applied to ELR to bar a fraudulent misrepresentation claim that

7    is materially indistinguishable from the fraudulent misrepresentation claim asserted in

8    Count Two.  *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990) ("[I]n the absence of

9    convincing evidence that the highest court of the state would decide differently, a federal

10   court is obligated to follow the decisions of the state's intermediate courts.") (cleaned up).

11   *See generally Gee v. Tenneco*, 615 F.2d 857, 861 (9th Cir. 1980) ("The task of a federal

12   court in a diversity action is to approximate state law as closely as possible in order to make

13   sure that the vindication of the state right is without discrimination because of the federal

14   forum.").

15        The bottom line is that Count Two is barred by the ELR.  This determination makes

16   it unnecessary to address Defendant's alternative dismissal arguments.[3]

17   **III.    Negligent Misrepresentation (Count Three)**

18        In Count Three of the SAC, Plaintiff alleges that Defendant negligently "represented

19   to Plaintiff that Defendant[] would provide the Subject Insurance" in accordance with the

20   Lease Agreement and that Defendant "thereby provided false information . . . within a

21   business transaction."  (Doc. 23 ¶¶ 54-56.)

22        A.    **The Parties' Arguments**

23        Defendant argues that Count Three is subject to dismissal because "the alleged

24

─────────────────────

25   [3]      The Court notes that Arizona courts, as well as federal courts applying Arizona law,
     are reluctant to apply the ELR to bar claims for fraudulent inducement.  *See, e.g., Shaw v.*
26   *CTVT Motors, Inc.*, 300 P.3d 907, 909 (Ariz. Ct. App. 2013) (noting that *Cook* "did not
     explicitly address the viability of a claim for fraudulent inducement under the [ELR]"); *D*
27   *Stadtler Trust 2015 Trust v. Gorrie*, 2023 WL 2503642, *32-33 (D. Ariz. 2023) (citing
     cases).   Count Two, however, does not purport to assert a claim for fraudulent
28   inducement—it is expressly styled as a claim for fraudulent misrepresentation.  Fed. R.
     Civ. P. 10(b) ("[E]ach claim founded on a separate transaction or occurrence . . . must be
     stated in a separate count.").

negligent misrepresentations are solely promises of future conduct" and "[a] promise of future conduct is not a statement of fact capable of supporting a claim of negligent misrepresentation."  (Doc. 27 at 12, citation omitted.)  Defendant also argues that "Plaintiff's negligent misrepresentation claim is a mere restatement of its breach of contract claim and thus fails as a matter of law."  (*Id.* at 13.)

In response, Plaintiff argues that "[t]he SAC alleges that [Defendant] represented a current obligation, not a future one" because Defendant is alleged to have "made a current representation, within the very terms of the Lease [Agreement], that [it was] under a current obligation to provide certain insurance."  (Doc. 29 at 11.)  Plaintiff further argues that Count Three "is distinct from the breach of contract claim, since this negligent misrepresentation claim involves [Defendant's] conduct before the Lease [Agreement] was executed."  (*Id.*)

In reply, Defendant argues that "Plaintiff strains to characterize its alleged promises of future conduct as present 'facts' to avoid dismissal" and that the SAC "alleges no *facts* on which it can sustain a negligent misrepresentation claim."  (Doc. 30 at 9.)

B.     **Analysis**

Arizona recognizes the tort of negligent misrepresentation as defined in the Restatement (Second) of Torts § 552(1) (1977), which provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Haisch v. Allstate Ins. Co.*, 5 P.3d 940, 944 (Ariz. Ct. App. 2000).  "The elements of negligent misrepresentation are: (1) the defendant provided false information in a business transaction; (2) the defendant intended for the plaintiff to rely on the incorrect information or knew that it reasonably would rely; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; (4) the plaintiff justifiably relied on the

incorrect information; and (5) resulting damage." *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 340 P.3d 405, 412 n.7 (Ariz. Ct. App. 2014). "Negligent misrepresentation may be by omission or nondisclosure of material facts as well as by overt misrepresentation." *Alaface v. Nat'l Inv. Co.*, 892 P.2d 1375, 1387 n.3 (Ariz. Ct. App. 1994).

"Under Arizona law, the tort of negligent misrepresentation requires a plaintiff to prove the defendant misrepresented present facts. A negligent misrepresentation claim cannot be based upon a promise of future conduct." *Bowman v. Honeywell Int'l, Inc.*, 438 F. App'x 613, 615 (9th Cir. 2011) (citing *McAlister v. Citibank*, 829 P.2d 1253, 1261 (Ariz. Ct. App. 1992)). "A negligent misrepresentation claim . . . cannot even stand on a promise made without present intention to perform." *Frank Lloyd Wright Found. v. Kroeter*, 697 F. Supp. 2d 1118, 1130 (D. Ariz. 2010) (cleaned up). Thus, allegations of misrepresentations relating to future-performance obligations under a contract are routinely held to fall outside the scope of Arizona's tort of negligent misrepresentation. *See, e.g.*, *Frank Lloyd Wright Found. v. Kroeter,* 2008 WL 5111092, *3 (D. Ariz. 2008) (finding allegations that defendant misrepresented that it would "honor its commitments under the agreement" to be "clearly a promise of future conduct" and granting defendant's motion to dismiss the negligent misrepresentation claim); *McAlister*, 829 P.2d at 1261 & n.4 (concluding that the defendant's alleged statements that it "would renew Plaintiff's $500,000 line of credit in a timely manner" and that "loan transfer requests would be processed in a timely manner" "all relate to future events" and affirming the trial court's dismissal because there was "no claim of relief for negligent misrepresentation").

Count Three is premised on Defendant's alleged representation that it *would* provide the Subject Insurance in accordance with the Lease Agreement. (Doc. 23 ¶ 54 ["Defendant[] represented to Plaintiff that Defendant[] would provide the Subject Insurance in accordance with Defendant['s] obligations under the Lease Agreement."]; *id.* ¶ 55 [identifying the "false information" as Defendant's statement that "Defendant[] would provide the Subject Insurance"]; *id.* ¶ 56 ["Defendant[] entered into the Lease Agreement

without any reason for Defendant[] to believe that Defendant[] would be providing Plaintiff with the Subject Insurance owed to Plaintiff under the terms of the Lease Agreement . . . ."]; *id.* ¶ 57 ["Defendant[] manifested this intent . . . by representing to Plaintiff on multiple occasions . . . that Defendant[] would perform all terms of the Lease Agreement, including terms requiring Defendant[] to provide the Subject Insurance."]; *id.* ¶ 61 ["Plaintiff reasonably and justifiably relied . . . that Plaintiff would be provided with the Subject Insurance, and that Defendant[] would cooperate in facilitating the providing of the Subject Insurance . . . ."].)  Although Plaintiff attempts to characterize these allegations as representations of present fact, they are only promises of future conduct.  Accordingly, Count Three is dismissed, and the Court need not address Defendant's alternative dismissal argument.

IV.    Breach Of The Implied Covenant Of Good Faith And Fair Dealing - Insurance (Count Four)

In Count Four of the SAC, Plaintiff alleges that once Defendant "chose to self-insure, [it was] . . . subject to the implied covenant of good faith and fair dealing." (Doc. 23 ¶ 69.)  Plaintiff further alleges that "[i]n assuming the role of self-insurer, Defendant[] also assumed the same fiduciary-like duties that an insurer owes to an insured under Arizona law." (*Id.* ¶ 77.)

A.    **The Parties' Arguments**

Defendant argues that a "party may bring an action in tort claiming damages for breach of the implied covenant of good faith, but only where there is a special relationship between the parties" and that Count Four "fails for a lack of a special relationship." (Doc. 27 at 13-14, cleaned up.)  Although Defendant acknowledges that Arizona courts have held that a special relationship exists between an insurer and an insured, Defendant argues that under *Gyau v. Total Transit*, 2025 WL 272244 (Ariz. Ct. App. 2025), "self-insurance arrangements are not insurance contracts" that "give rise to a 'special relationship' as a matter of law." (*Id.* at 14.)

In response, Plaintiff argues that Defendant's "reliance on the unpublished [*Gyau*]

case is unavailing" because "*Gyau* concerned self-insurance for oneself, not self-insurance undertaken for the benefit of a third party," and "[t]he special relationship is therefore sufficiently alleged in the SAC." (Doc. 29 at 11-12.)

In reply, Defendant argues that *Gyau* "is indistinguishable from Plaintiff's theory here." (Doc. 30 at 10.) Defendant also argues that Plaintiff "cites no authority contradicting [Defendant]'s position that 'self-insurance' arrangements are not insurance contracts giving rise to a special relationship." (*Id.* at 9.)

### B.   **Analysis**

Arizona "law implies a covenant of good faith and fair dealing in every contract." *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986). "The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Id.* "The duty not to act in bad faith or deal unfairly thus becomes a part of the contract, and, as with any other element of the contract, the remedy for its breach generally is on the contract itself." *Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1038 (Ariz. 1985). Nevertheless, when certain special relationships are implicated, including "the special relationship between an insurer and its insured, the insured may maintain an action to recover tort damages." *Rawlings*, 762 P.2d at 579. "Courts have been reluctant, however, to extend the tort action beyond the insurance setting. The rationale for permitting tort recovery in insurance contract disputes and not in disputes involving other contracts has been founded largely upon the existence of a 'special relationship' between insurer and insured." *Wagenseller*, 710 P.2d at 1040. Therefore, only "in certain circumstances" will "the breach of the implied covenant . . . provide the basis for imposing tort damages." *Burkons v. Ticor Title Ins. Co.*, 813 P.2d 710, 720 (Ariz. 1991).

In *Gyau*, Total Transit provided Gyau with insurance coverage as a condition of his work for Total Transit as an independent-contractor taxi driver. *Gyau*, 2025 WL 272244 at *1. Part of the insurance coverage included "that Total Transit was responsible for a $500,000 self-insured retention ('SIR')." *Id.* After Gyau was injured in an accident, Gyau

sought underinsured motorist benefits from Total Transit, which denied the claim. *Id.* at *1-2. The Gyaus then sued Total Transit and asserted, among other things, a claim for insurance bad faith. *Id.* at *2. The trial court granted Total Transit's motion for summary judgment and the Arizona Court of Appeals affirmed, holding that "'self-insurance' arrangements are not insurance contracts" and that "the principles of law specific to insurance contracts do not apply to the Gyaus' claims." *Id.* at *3-4. The court further held, in reference to Gyaus' claim for breach of the implied covenant of good faith and fair dealing, that "[w]ithout such relationships between Mr. Gyau and Total Transit, the Gyaus cannot recover tort damages." *Id.* at *6.

Plaintiff's attempts to distinguish *Gyau* are unavailing. Although *Gyau* may be unpublished, it is the only Arizona authority the Court has found addressing the issue of self-insurance and the covenant of good faith and fair dealing in Arizona. Arizona authorizes consideration of unpublished appellate decisions issued after January 1, 2015 for their persuasive value, *see* Ariz. Supreme Court R. 111(c), and the Court finds *Gyau* persuasive. *See also Kirkland*, 915 F.2d at 1239 ("[I]n the absence of convincing evidence that the highest court of the state would decide differently, a federal court is obligated to follow the decisions of the state's intermediate courts.") (cleaned up). Additionally, *Gyau* is consistent with decisions from outside Arizona concluding that self-insurance arrangements are not insurance contracts. *See, e.g.*, *Black v. Church Pension Grp. Servs. Corp.*, 2015 WL 2058809, *3-4 (N.D. Cal. 2015) (noting that "an entity that self-insures is not an insurer" under California insurance law) (cleaned up); *Simmons v. Puu*, 94 P.3d 667, 682 (Haw. 2004) ("[S]elf-insurers are not insurers, inasmuch as they are not in the business of making contracts of motor vehicle insurance.") (cleaned up); *Wake Cnty. Hosp. Sys., Inc. v. Nat'l Cas. Co.*, 804 F. Supp. 768, 774 (E.D.N.C. 1992) (collecting cases and noting that "a majority of . . . courts have ruled that self-insurance is not insurance at all"). This, too, is a relevant consideration when deciding the status of state law in a diversity case. *Kirkland*, 915 F.2d at 1239 (one predictive tool is "decisions from other jurisdictions").

Nor is there any merit to Plaintiff's argument that *Gyau* is distinguishable because

1    it concerned self-insurance for oneself, not self-insurance undertaken for the benefit of a

2    third party.  The facts of *Gyau* suggest that Total Transit self-insured not for itself, but for

3    the benefit of its independent contractor Gyau—a third party.

4          In sum, Defendant's decision to self-insure does not give rise to the "special

5    relationship" necessary for Plaintiff to obtain relief in tort based on its implied-covenant

6    claim in Count Four.  Accordingly, Count Four is dismissed.

7    V.    Fraudulent Concealment (Count Five)

8          In Count Five of the SAC, Plaintiff alleges that "Defendant[] had a duty to disclose

9    whether [it] had elected to self-insure pursuant to Paragraph 11(d) of the Lease Agreement

10   and whether [it] had in fact obtained or maintained the required insurance coverage." (Doc.

11   23 ¶ 86.)  Plaintiff further alleges that Defendant "concealed [its] election to self-insure"

12   and "allowed Plaintiff to submit a formal insurance claim, interact with third-party

13   adjusters, and reasonably believe that commercial insurance was in place." (*Id.* ¶¶ 88-89.)

14         A.    **The Parties' Arguments**

15         Defendant argues that "[b]y Plaintiff's own allegations self-insurance is expressly

16   allowed by the Lease" and that "Plaintiff's claim should be dismissed on this basis alone."

17   (Doc. 27 at 15.)  Alternatively, Defendant argues that "[n]either Section 11(d) of the Lease,

18   nor any other provision of the Lease, requires [Defendant] to inform Plaintiff of its decision

19   to self-insure.  And even if it did, the only arguably cognizable claim . . . would be for

20   breach of contract, not fraud." (*Id.*)  Defendant further argues that, at worst, its alleged

21   failure to disclose is not concealment, but mere silence insufficient to state a claim for

22   fraudulent concealment.  (*Id.* at 15-16.)  Next, Defendant argues that Plaintiff "does not

23   plausibly plead damages resulting from the alleged concealment with particularity," and

24   that "by Plaintiff's own allegations, the fire is the cause of the 'loss of use of the Premises'

25   and 'property damage,' not any alleged concealment of a self-insurance election." (*Id.* at

26   16.)  Finally, Defendant reasserts its arguments regarding the ELR, arguing that "Plaintiff's

27   fraudulent concealment claim is also barred by the [ELR]." (*Id.*)

28         In response, Plaintiff argues that Defendant "took active steps to conceal its election

to self-insure, including allowing [Plaintiff] to interact with purported insurers for months. This goes beyond 'mere silence.'" (Doc. 29 at 12.)  Plaintiff also points to various portions of the SAC that purportedly support its allegations.  (*Id.*)  Plaintiff further argues that Defendant "concealed [its] true election, which [it] had decided from the outset—that [it] actually [was] electing to self-insure." (*Id.* at 12-13.)

In reply, Defendant begins by asserting that Plaintiff failed to respond to some of its dismissal arguments and contends that "the Court can dismiss the claim on this basis alone."  (Doc. 30 at 10.)  Defendant also argues that "Plaintiff does not allege that [Defendant] had any knowledge of Plaintiff's conduct (because it did not)."  (*Id.*)  Defendant also reasserts its argument that Plaintiff failed to allege damages arising from the alleged concealment.  (*Id.* at 11.)

### B.    **Analysis**

Arizona recognizes the tort of fraudulent concealment as defined in the Restatement (Second) of Torts § 550 (1976), which provides:

> One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering.

*Wells Fargo Bank*, 38 P.3d at 34.  "Fraudulent concealment differs from mere silence and must involve deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter.  A party may be liable for intentional concealment for acts taken to conceal, mislead, or otherwise deceive, even in the absence of a fiduciary, statutory, or other legal duty to disclose."  *HTA-SC Boswell Med. LLC v. Sun Health Servs.*, 2019 WL 439294, *3 (Ariz. Ct. App. 2019) (cleaned up).

Plaintiff's theory is that Defendant fraudulently concealed the fact that Defendant elected to self-insure, thereby inducing Plaintiff to submit a formal insurance claim and interact with Defendant's third-party adjusters.  The Court, however, fails to see how Defendant's decision to self-insure—an option expressly authorized by the Lease

Agreement (Doc. 23 at 51)—could rise to the level of a deceptive act intended to prevent Plaintiff from acquiring material information. *Meredith v. BankUnited for BankUnited, FSB*, 2011 WL 13233483, *13 (D. Ariz. 2011) ("Plaintiffs allege that Defendants engaged in fraudulent concealment when they failed to disclose that Plaintiffs' loan would be securitized, but they do not explain how this fact is material. . . . It is unclear how this could give rise to a fraudulent concealment claim, particularly because the hallmark of such a claim is hiding information with the intention of inducing another party to act.").

At any rate, Count Five is also subject to dismissal for an independent reason—Plaintiff has failed to allege damages arising from the alleged act of concealment. Plaintiff alleges it suffered damages "including loss of insurance coverage benefits, loss of use of the Premises, property damage, and other consequential and incidental losses in an amount to be proven at trial." (Doc. 23 ¶ 93.) But Plaintiff does not explain how any of these damages arose from Defendant's alleged concealment of the fact that it chose to self-insure (as it was contractually permitted to do) rather than obtain insurance from a third-party insurance provider.

For these reasons, Count Five is dismissed, and the Court need not address Defendant's alternative dismissal arguments.

## VI.    Leave To Amend

Defendant argues that leave to amend would be futile and should be denied. (Doc. 27 at 16.) According to Defendant, "futility is further demonstrated by Plaintiff's inability to cure these pleading deficiencies in their Second Amended Complaint." (*Id.* at 16-17.) In response, Plaintiff requests leave to amend, stating it is "prepared to provide additional detail regarding the underlying events and relationship of the parties." (Doc. 29 at 13.)

"Rule 15 advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.* (citation omitted). Thus, the Court should grant leave to amend unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."

*AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). "An amendment is futile when 'no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense.'" *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) (citation omitted).

Although the Court is skeptical that Plaintiff will be able to plead additional facts to cure the deficiencies identified above, it will, in an abundance of caution, grant Plaintiff's amendment request. True, Plaintiff has already amended its complaint twice, but Defendant was only forced to file a motion to dismiss in response to the SAC. Under the circumstances, one more opportunity for amendment is warranted.

Accordingly,

**IT IS ORDERED** that:

1.    Defendant's motion to dismiss (Doc. 27) is **granted**.

2.    Counts Two, Three, Four, and Five are dismissed with leave to amend.

3.    Plaintiff may file a Third Amended Complaint ("TAC") within 14 days of the issuance of this order. Any changes shall be limited to attempting to rectify the deficiencies identified in this order. Plaintiff shall, consistent with LRCiv 15.1, attach a redlined version of the pleading as an exhibit.

Dated this 12th day of January, 2026.

Dominic W. Lanza
United States District Judge

- 19 -